_____

CLARENCE LEE ARTIS, JR,

                                        Plaintiff,

            vs.                                      9:14-CV-1116
                                                     (MAD/ATB)

J. DISHAW,

                                        Defendant.
_____

CLARENCE LEE ARTIS, JR, Plaintiff pro se
RYAN W. HICKEY, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

        This matter has been referred to me for Report and Recommendation pursuant to

28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c).  Plaintiff originally filed this

action against several defendants, alleging a variety of civil rights violations, relating to

plaintiff's confinement at Upstate Correctional Facility ("Upstate"). (Complaint

("Compl.")) (Dkt. No. 1).  On February 4, 2015, the Honorable Mae A. D'Agostino,

granted plaintiff's motion to proceed in forma pauperis ("IFP"), but ordered dismissal of

the entire action without prejudice for failure to state a claim. (Dkt. No. 8).  In her order,

Judge D'Agostino gave plaintiff thirty (30) days to file an amended complaint in which

he could attempt to cure the deficiencies in the original. (*Id.* at 8, 11).

        On February 23, 2015, plaintiff filed his amended complaint, making claims

against several defendants. (Amended Complaint ("AC")) (Dkt. No. 9).  On April 1,

2015, Judge D'Agostino reviewed the amended complaint and ordered dismissal of all

defendants except J. Dishaw. (Dkt. No. 11). The remaining claims against this defendant are as follows:

> (1)     Defendant Dishaw violated plaintiff's right to be free from cruel and unusual punishment when he refused to provide plaintiff food, after plaintiff was transferred "down stairs in December 2014." (Dkt. No. 11) (citing AC at 8).

> (2)     On December 31, 2014, defendant Dishaw wrote a false misbehavior report against plaintiff in retaliation for a grievance that plaintiff filed against Dishaw on July 10, 2014 in violation of plaintiff's First Amendment rights. (*Id.*) (citing AC at 8).

Presently before the court is the defendant's motion for summary judgment pursuant to Fed. R. Civ. P. 56. (Dkt. No. 25). Plaintiff has responded in opposition to the motion, defendant has filed a reply, and plaintiff has filed a sur-reply. (Dkt. Nos. 28, 31, 32). For the following reasons, this court agrees that the amended complaint should be dismissed.

## DISCUSSION

I.     <u>Facts</u>

For clarity, in this section the court will summarize the facts relative to plaintiff's remaining claims which appear in the amended complaint itself. I will then discuss additional facts below that have been developed through discovery and that are reflected in exhibits to the summary judgment motion.

On July 10, 2014, after a disagreement over a religious meal on July 9th, with officers who are no longer defendants in this action, plaintiff was told that he was going

to be moved "back down stairs and stripped of his level and items."[1] (AC ¶ 4, CM/ECF p.7-8). Plaintiff states that, on the way downstairs, defendant Dishaw told plaintiff that if he wanted to "eat regular trays" and "get extra trays and [tobacco] for the rest of [his] stay," he would have to assault another inmate.[2] (*Id.* at 8). Plaintiff alleges that he "grieved" defendant Dishaw's conduct on the same day. (*Id.*) Plaintiff claims that after that grievance, defendant Dishaw threatened him and tried to encourage fights between plaintiff and any other inmate who happened to be his cell mate. (*Id.*)

Plaintiff claims that on December 31, 2014, defendant Dishaw wrote a false misbehavior report against plaintiff in "retaliation," and "on New Year, he moved me down stairs,"[3] telling plaintiff that he made a big mistake going against his orders. Plaintiff claims that he filed "at least" three grievances against defendant Dishaw, but then stopped filing grievances because defendant Dishaw would stop feeding him. Plaintiff states that the was "really hungry," and he had lost thirty pounds "already." (*Id.*) The amended complaint then states that "[n]ow I've lost 52 pounds because of me grieving and not wanting to be used as goon for CO's [sic] – [s]pecifically CO J.

---

[1] Plaintiff's "level" refers to his Progressive Inmate Movement System ("PIMS") level. (Dishaw Decl. ¶ 21). Inmates at Upstate may earn privileges for good behavior under PIMS. (*Id.*) Inmates with a higher PIMS level are eligible to be house on a higher floor. (*Id.* ¶ 23). When an inmate receives a misbehavior report, his PIMS level is reduced, and he is moved back to a lower floor. (*Id.* ¶ 24). Thus, when plaintiff states that he lost his "level," this means that he was moved to a lower floor of the facility due to his misbehavior.

[2] Plaintiff claims that defendant Dishaw asked plaintiff to break the other inmate's fingers "every time he wrote a grievance." (AC at CM/ECF pp.8-9).

[3] Plaintiff's PIMS level was restored on September 13, 2014, and plaintiff was moved back upstairs until the December 31, 2014 misbehavior report. (Dishaw Decl. Ex. C at 4 - Internal Movement History) (Dkt. No. 25-13).

Dishaw." (*Id.*)

## II.   <u>**Summary Judgment**</u>

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d at 273.  In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

## III. Exhaustion of Administrative Remedies

### A. Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id*. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id*. § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, ___ U.S. ___, 136 S. Ct. 1850, 1857) (2016). "'[M]andatory exhaustion statutes like the PLRA

establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, No. 15-3336-pr, 2016 WL 4572321, at *2 (2d Cir. Sept. 1, 2016) (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1857).  Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid.  The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, __ U.S. at __, 136 S. Ct. at 1858.  Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id. See Riles*, 2016 WL 4572321 at *2.  An administrative procedure is "unavailable" when

> (1) "it operates a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Riles, supra* (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Ross*, __ U.S. at __, 136 S. Ct. at 1859-60.  The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859.  The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.*  Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the

grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

## B. Application

In this case defendant argues that plaintiff failed to exhaust his administrative remedies with respect to both remaining claims against defendant Dishaw. (Def.'s Mem. at 8-10) (Dkt. No. 25-2). Defendants have filed declarations by Jeffrey Hale, Assistant Director of the DOCCS Inmate Grievance Program ("IGP") and Donna Wilcox, IGP Supervisor at Upstate.[4] (Dkt. Nos. 25-6 – 27-9). Defendants claim that the Upstate inmate grievance office has no record of any grievances relating to defendant Dishaw retaliating against plaintiff for his grievances against the defendant by issuing a false misbehavior report on December 31, 2014 or "sometimes" refusing to provide plaintiff food, causing plaintiff to lose between thirty and fifty-two pounds. (Def.'s Mem. at 10).

Assistant Director Hale states that the CORC has "no record of any appeals of grievances by plaintiff" which relate either to the retaliatory misbehavior report or to the alleged denial of food. (Hale Decl. ¶ 11). Exhibit A to the Hale Declaration is a list of the plaintiff's grievances that were appealed to the CORC between August 22, 2012 and April 1, 2015. (Hale Decl. Ex. A) (Dkt. No. 25-7). Assistant Director Hale cites to a grievance filed by plaintiff on December 24, 2014 (prior to the alleged retaliatory misbehavior report), in which plaintiff alleges that he was denied kosher food and was "provoked" to fight with another inmate on December 17, 2014. (Hale Decl. ¶ 12 & Ex.

---

[4] Assistant Director Hale's Exhibit lists grievances filed by plaintiff that he appealed all the way to the CORC, while IGP Supervisor Wilcox's list also includes grievance that may have been filed at the facility level which were not appealed to the CORC.

A).  However, Assistant Director Hale states that the grievance does not claim that defendant Dishaw denied plaintiff his meal.[5] (*Id.*)

IGP Supervisor Wilcox states that the Upstate IGP has no record of any grievances relating to the allegations plaintiff makes in this federal case. (Wilcox Decl. ¶12 & Ex. A).  IGP Supervisor Wilcox also cites the plaintiff's December 17, 2014 grievance, and she also states that it does not relate to the facts in this case. (Wilcox Decl. ¶ 13).  Exhibit A to the Wilcox Declaration is a list of grievances that plaintiff filed at the facility level between April 28, 2014 and March 19, 2015. (Wilcox Decl. Ex. A) (Dkt. No. 25-9).

The Hale declaration shows that, on July 17, 2014, plaintiff filed a grievance, which was appealed to the CORC, alleging that he was "Forced to Break [his] Fast" and he was "Goaded to Fight." (Hale Decl. Ex. A).  A copy of the actual grievance documents are attached to the Dishaw Declaration. (Dishaw Decl. Ex. B at CM/ECF pp.4-12).  The facts recited by plaintiff in the July 17, 2014 grievance coincide with the facts stated in plaintiff's amended complaint, in which he claims that he argued with two former defendants about breaking his Ramadan fast and was later asked by defendant Dishaw if he would assault another inmate.[6] (AC ¶ 4).  Thus, plaintiff did file a grievance against Dishaw that he claims was the cause of all the subsequent harassment

---

[5] Copies of the grievance documents were not included.

[6] The date of this grievance does not match the facts stated in the amended complaint.  Plaintiff alleges that he filed the grievance against defendant Dishaw on July 10, 2014, but the actual grievance is dated July 17, 2014, and the amended complaint does not mention that the grievance included the Ramadan claims.

and "retaliation." The question, for exhaustion purposes, is whether plaintiff exhausted his claim that defendant Dishaw retaliated against plaintiff because of the July 17, 2014 grievance.

Plaintiff filed a grievance on September 4, 2014, entitled: "Refused Treatment." (Hale Decl. Ex. A). The September 4, 2014 grievance was appealed to the CORC, but it does not appear to be related to defendant Dishaw. (*Id.*) The last grievance that plaintiff appealed to the CORC was originally filed on December 24, 2014, prior to the allegedly false misbehavior report of December 31, 2014, and it is entitled "Denied Tray/Tried to Provoke Fight." (*Id.*) It is unclear what facts plaintiff alleged in that grievance because the court only has the title of the grievance. However, it would not suffice to exhaust any claims that the false misbehavior report dated December 31, 2014 was in retaliation for the July 2014 grievance. Although plaintiff alleges that defendant Dishaw retaliated against him beginning after the first grievance, there are no grievances which complain about this retaliatory behavior, and only one grievance that alleges that plaintiff was denied any food, as retaliation for grievances or simply as a stand-alone claim for cruel and unusual punishment.

The list of grievances attached to the Wilcox Declaration includes a few more grievances that were filed by plaintiff, but were not appealed to the CORC because they do not appear on the CORC list. (Wilcox Decl. Ex. A). On August 26, 2014, plaintiff filed a grievance claiming that he was called names by a corrections officer. (*Id.*) On December 22, 2014, plaintiff filed a grievance, complaining about a cell search and a racial epithet. (*Id.*) Finally, on March 19, 2015, plaintiff filed a grievance complaining

10

that he was given a "rotten apple" and that someone made a sexual gesture. (*Id.*)

In his response to defendant's motion for summary judgment, plaintiff claims that he exhausted his administrative remedies. He claims that he spoke to sergeants and lieutenants and "constantly grieved" his situation "to no avail." (Dkt. No. 28 at 3). Plaintiff also claims that some of his grievances were destroyed, and his "life was threatened" so he "had to stop or be killed." (*Id.*) Plaintiff states that "they" did not allow "a lot of his grievances to be filed." (Dkt. No. 28 at 2). Plaintiff states that, in his possession, he has a grievance which relates to food portions that does not appear on the Wilcox list or the Hale list of grievances. Plaintiff claims that this shows that the grievance summary submitted by IGP Supervisor Wilcox "is incorrect." (*Id.*)

"Speaking" to sergeants and lieutenants does not excuse the failure to use the grievance process. *See Macias v. Zenk*, 495 F.3d 37, 44-45 (2d Cir. 2007) (informal steps, putting officials on "notice" are insufficient to exhaust administrative remedies); *Gizewski v. NY DOCCS*, No. 9:14-CV-124, 2016 WL 3661434, at *14 (N.D.N.Y. July 5, 2016) (notice through informal channels, including verbal complaints, is insufficient to exhaust administrative remedies). Plaintiff's grievance records do not support his statement that he "constantly grieved [his] situation.". In an effort to show that he did file grievances about food, and that IGP Supervisor Wilcox's list is "incorrect," plaintiff has submitted a copy of a CORC response to a grievance filed on July 10, 2014,[7]

---

[7] As stated in the "Fact" section above, plaintiff states in his amended complaint that he filed his grievance against defendant Dishaw on July 10, 2014. (AC ¶ 4 at p.8). However, the records reveal that the grievance mentioning defendant Dishaw was actually filed on July 17, 2014, and the July 10, 2014 grievance was related to food "portions." Plaintiff may simply be confused about the dates.

complaining about food "portion" sizes. (Dkt. No. 28-1).

The CORC response states that the Food Service Administrator investigated plaintiff's allegations and determined that portion sizes were consistently maintained. (*Id.*) The response suggested that, if plaintiff had a problem with his tray, he should bring it to the attention of the gallery officer to allow for corrective action. (*Id.*) In her reply declaration, IGP Supervisor Wilcox states that this grievance was a consolidated request from plaintiff and three other inmates which simply complained about portion sizes, relative to the kitchen staff filling the food trays with the appropriate number of "scoops" of food. (Wilcox Reply Decl. ¶ 7). This is the reason that the grievance was not listed on plaintiff's list of grievances. (*Id.*)

Plaintiff also argues that the CORC response to the July 10, 2014 grievance shows that he complained about food, but also shows that gallery officers "can easily tamper with trays." (*Id.*) Plaintiff argues that this proves that defendant Dishaw could have tampered with his tray after it came from the kitchen, regardless of the portion of food that was originally on the tray. In defendant's reply, IGP Supervisor Wilcox has filed the rest of the documents associated with the "consolidated" July 10, 2014 grievance. (Wilcox Reply Decl. Ex. A). A review of the grievance filed by plaintiff and three other inmates only states that they would like "the maximum servings of 3 scoops of food as the main cours[e]. Now that we have new bigger trays we are being served less food." (Wilcox Reply Decl. Ex. A at 5). The grievance states that inmates were being served 1 ½ to 2 scoops, and that he and the "rest of the population here at upstate would like for the food portion to resume back to normal serving sizes . . . ." (*Id.* at 6).

The portion of the consolidated grievance that was signed by the plaintiff is actually dated July 7, 2014 and states that he had "approximately 8 (eight) french fries in my feed up tray."[8] (*Id.* at 7). Plaintiff states that he showed his tray to the "Sgt. and C.O.s working the gallery during the last feed up of the day." (*Id.*) The other inmates whose grievances were consolidated were making the same complaint about the portions, including friench fries and pizza. (Wilcox Reply Decl. Ex. A at 8-15). Defendant Dishaw is not even mentioned in the grievance, and in fact, this incident took place three days prior to the incident described by plaintiff as the beginning of defendant Dishaw's alleged retaliation, when plaintiff allegedly refused to assault another inmate at Dishaw's behest.[9] The part of the consolidated grievance signed by plaintiff also states that he had already lost 30 pounds, that this was against his will, and was "cruel and unusual punishment."[10] (*Id.*)

---

[8] A review of the amended complaint shows that the french fry incident related to a dismissed claims as against former defendant Labarge. (AC ¶ 3). Plaintiff stated that defendant "came to my cell one day during breakfast with another C.O. and placed something on my cell door to indicate some sort of message to give me a specially made up tray with like 7 french fries and half a chicken pattie [sic] this was on June 7, 2014. This is a constant assaulting and harassment since that first 5-22-14 encounter." (*Id.*)

[9] In the amended complaint, plaintiff states that the incident with defendant Dishaw happened on July 10, 2014

[10] In the CORC's November 19, 2014 response to the grievance, the CORC advised plaintiff to "address his weight loss concerns via sick call." (Wilcox Reply Decl. Ex. A at 18).

This grievance did not exhaust any claims against defendant Dishaw.[11]  There are no

grievances which complain that plaintiff lost fifty two pounds as a result of defendant

Dishaw's conduct.  The amended complaint vaguely states that "sometimes" he would

not give me a tray at all." (AC ¶ 4 at p.8).  Plaintiff's amended complaint is so vague,

that it is unclear whether plaintiff was alleging that he had "already" lost 30 pounds, and

then after December 31, 2014, he lost more weight or whether plaintiff claims that

defendant Dishaw denied him food beginning in July of 2014.  Under either

interpretation of the amended complaint, plaintiff has failed to exhaust his claim that

defendant Dishaw was denying him food in violation of the Eighth Amendment.

On December 24, 2014, plaintiff filed a grievance entitled "Denied Tray/Tried to

Provoke Fight," which he appealed to the CORC. (Dkt. No. 25-7).  Defendant argues

that this does not suffice to exhaust plaintiff's administrative remedies because it

happened before the December 31, 2014 misbehavior report, and defendant Dishaw was

not mentioned.  The court notes that defendant has interpreted the amended complaint to

---

[11] The court notes that the Wilcox Reply Declaration also contains an older grievance complaining about "Inadequate Portions," filed on January 15, 2014, and decided by the CORC on June 11, 2014, long before the Dishaw incident. In plaintiff's sur-reply, he now states that he and other inmates used to "beat up" inmates for defendant Dishaw for extra food and cigarettes. (Dkt. No. 32). Plaintiff states that "after April of 2014," he decided to stop that behavior, and that is when defendant Dishaw began harassing, threatening, and not feeding plaintiff. (*Id.*) Plaintiff changes his facts every time that he files papers. There is nothing in the amended complaint that indicates that plaintiff had trouble with defendant Dishaw prior to July of 2014, and the amended complaint began with incidents dating back to March of 2014. (AC ¶ 1). A review of the grievances that plaintiff filed shows that he filed at least four grievances prior to July of 2014, and none of them appear to deal with defendant Dishaw. In fact, all the grievances prior to July 17, 2014 can be associated with facts that plaintiff alleged in the amended complaint, relating to dismissed claims, none of which involve defendant Dishaw. (Wilcox Decl. Ex. A; AC ¶¶ 1-3). During his deposition, plaintiff testified that his "best estimate" was that he started filing grievances against defendant Dishaw in July of 2014. (Pl.'s Dep. at 16-17). He testified that the "whole thing started with Officer Dishaw" "around June 9th or July 9th." (*Id.* at 16).

allege that the denial of food occurred after the December 31, 2014 misbehavior report. Although as stated above, the complaint can be interpreted liberally to claim that defendant Dishaw denied plaintiff food before and after December 31, 2014, plaintiff has still failed to exhaust his Eighth Amendment claim.

In his amended complaint, plaintiff claims that the retaliation started when plaintiff filed a grievance against Dishaw in July of 2014, and Dishaw retaliated by depriving plaintiff of food and "ultimately" filing an allegedly false misbehavior report against plaintiff on December 31, 2014. (AC at 8). The July 17, 2014 grievance includes the allegation that plaintiff was "Goaded to Fight." (Hale Decl. Ex. A). In this grievance, plaintiff did claim that "Officer D" offered him trays or tobacco to assault another inmate." (Dishaw Decl. Ex. C at 4). However, the question is not whether plaintiff brought the original grievance against defendant Dishaw. Clearly, he did.[12] The issue is whether plaintiff exhausted the allegations that defendant Dishaw retaliated against plaintiff because of the grievance that plaintiff brought on July 17, 2014, by denying him food or filing a false misbehavior report.

The grievance filed on December 24, 2014 does not exhaust plaintiff's claim that the misbehavior report on December 31, 2014 was retaliatory. In addition, denying plaintiff "a tray," even if defendant Dishaw was the individual who did deny the tray, would not alert the prison officials to plaintiff's claim that he was being tortured with the denial of food. Thus, the court could recommend dismissal for failure to exhaust the

---

[12] The record contains defendant Dishaw's statement to the grievance interviewer, denying that he offered plaintiff extra trays and tobacco if he would assault another inmate. (Dishaw Decl. Ex. B) (Dkt. No. 25-12 at 12).

Eighth Amendment claim. However, as discussed below, the court finds that plaintiff's second claim is exhausted and will consider the merits of both claims.[13]

Although defendant also alleges that there was no grievance filed regarding the retaliatory misbehavior report, it is clear that plaintiff raised this claim in his defense to the disciplinary hearing. (Hickey Decl. Ex. B) (Disciplinary Hearing Transcript ("T") at 7). The hearing officer specifically asked defendant Dishaw "[d]id [the misbehavior report] have anything to do with retaliation for this inmate writing grievances." (*Id.*) Defendant Dishaw responded "[a]bsolutely not." Plaintiff even raised his allegation that defendant Dishaw asked plaintiff to assault another inmate. (*Id.* at 8-9). This issue was discussed thoroughly, plaintiff named the inmate who defendant Dishaw asked plaintiff to assault, and defendant Dishaw stated that he did not even know who this inmate was. (*Id.* at 9).

Although defendant claims that plaintiff could file a grievance alleging harassment or retaliation by a corrections officer, it would have been futile to do so,

---

[13] In his response to the summary judgment motion, plaintiff alleges that he tried to file several grievances, but that "some" grievances were destroyed or plaintiff's life was threatened, so that he had to "stop or be killed." (Dkt. No. 28 at 3). *Ross* holds that if a defendant prevents plaintiff from filing grievances through malfeasance or threats, the grievance procedure is "unavailable." 136 S. Ct. at 1860. Plaintiff raises this allegation only in his response to defendant's motion for summary judgment. The court also notes that plaintiff filed five grievances after the July 17, 2014 grievance against defendant Dishaw and others. Plaintiff also called defendant Dishaw as a witness at the disciplinary hearing held after the allegedly false misbehavior report and questioned him about retaliation. It does not appear that plaintiff feared for his life, and it did not stop him from filing subsequent grievances. After *Ross*, it is unclear what sort of intimidation is sufficient, and how plaintiff would need to establish the intimidation in order to make the grievance procedure "unavailable." Additionally, plaintiff states that some grievances were destroyed, but he has not submitted any copies of these grievances, nor does he specify when he attempted to file them. In any event, even if the administrative remedies were "unavailable" under *Ross*, this court also finds that plaintiff's claim is meritless.

after the issue was fully discussed at the disciplinary hearing. Plaintiff would have had no reason to think that a grievance would have been successful or available under the circumstances. In fact, a review of the CORC response to plaintiff's July 17, 2014 grievance shows that when the interaction with officers results in a misbehavior report, the disciplinary "appeal mechanism affords the opportunity to remedy any factual or procedural errors in a disciplinary report."[14] (Dishaw Decl. Ex. B at 4). Thus, according to the CORC's own decision, it would lack the authority to provide plaintiff the "remedy" he seeks because the issue would have to be determined through the appeal mechanism for disciplinary hearings. Plaintiff's attempt at raising the issue as a defense to his misbehavior report, and his subsequent appeal thereof, would suffice to exhaust his claim that defendant Dishaw retaliated against him by filing an allegedly false misbehavior report. *See Ross*, __ U.S. __, 136 S. Ct. at 1859 (grievance procedure is "unavailable" when the relevant "administrative procedure" lacks the authority to provide "any" relief). Thus, plaintiff's second claim is exhausted, and the may proceed to a consideration of the merits.

---

[14] In addition, "[w]here an inmate's federal claims arise directly out of a disciplinary or administrative segregation hearing, . . . (e.g., a claim of denial of procedural due process), he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal." *Sweet v. Wende Corr. Facility*, 514 F. Supp. 2d 411, 413 (W.D.N.Y. 2007) (internal quotation and citations omitted). *See also Davis v. Barrett*, 576 F.3d 129, 131-32 (2d Cir. 2009). While the plaintiff's challenges in this case do not relate to due process, it is clear that plaintiff's issue with defendant Dishaw was thoroughly discussed at the disciplinary hearing.

## IV. Eighth Amendment Claim

### A. Legal Standards

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway*, 37 F.3d at 66 (quoting *Wilson v. Seiter*, 501 U.S. at 298). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions- of-confinement' claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (citing *Hudson v. McMillan*, 503 U.S. 1, 9 (1992) (only those deprivations denying "the minimal civilized measures of life's necessities" are sufficiently serious to form the basis of an Eighth

Amendment violation) (internal quotations and citations omitted).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter*, 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway*, 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.*

"Under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin*, 725 F.2d 12, 15-16 (2d Cir. 1983) (citations omitted); *Moss v. Ward*, 450 F. Supp. 591, 596-97 (W.D.N.Y. 1978) (disciplinary penalty that denied inmate all food for four days violated the Eighth Amendment). The Eighth Amendment requires that prisoners be served nutritionally adequate food that does not present "'an immediate danger to heath and well being of the inmates who consume it.'" *Johnson v. Fischer*, No. 9:12-CV-210, 2015 WL 670429, at *41 (N.D.N.Y. Feb. 17, 2015) (quoting *Robles*, 725 F.3d at 15).

The subjective prong of the Eighth Amendment analysis is met when the defendant knows that the diet was inadequate and likely to inflict pain. *Id.* (citing *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002)). However, courts in this circuit have held that missing a single meal is insufficient to state a claim for relief. *Rush v. Fischer*,

923 F. Supp. 2d 545, 555-56 (S.D.N.Y. 2013) (citing *Hankerson v. Nassau Cnty. Corr. Facility*, No. 12 Civ. 5282, 2012 WL 6055019, at *3 (E.D.N.Y. Dec. 4, 2012) (allegation that plaintiff was denied a single meal while incarcerated . . . does not give rise to a constitutional deprivation); *Scarbrough v. Evans*, No. 11 Civ. 131, 2012 WL 4364511, at *5 (N.D.N.Y. May 17, 2012) (denial of a single meal is insufficient to state a claim for relief).

### B.    Application

Plaintiff alleges that defendant Dishaw "sometimes" would not give him his tray of food. (AC at 8). Plaintiff's never specifies any dates or how long the alleged deprivation would last. In his response to defendant's motion for summary judgment, he alleges that defendant would give plaintiff the "loaf" when he was supposed to get regular trays,[15] but "most times," he would not give plaintiff any tray at all. (Dkt. No. 28 at 3).

The court first notes that plaintiff initially claimed that as a result of the alleged deprivation of food, he lost from 30 to 52 pounds. However, plaintiff claimed the grievance that he filed in conjunction with other inmates that he lost 30 pounds because the portions were too small. This initial weight loss had nothing to do with defendant Dishaw or his alleged occasional denial of a food tray. During his deposition, he admitted that he did not lose 52 pounds, and that it could have seemed worse than it

---

[15] The court would point out that plaintiff was on a restricted diet twice during the time period relevant to this amended complaint. Both times, the "restricted diet" was imposed in relation to a disciplinary hearing and was approved and monitored by the medical department. (Smith Decl. Ex. A at 54-57 – Feb. 11, 2015 to Feb. 13, 2015, 105-114 – July 10, 2014 to July 16, 2014)).

was. (Pl.'s Dep. at 51). He testified that he "felt" like he lost 52 pounds, but that it could have been because of the "poison" and the diarrhea. (*Id.* at 52). Plaintiff admitted that he was exaggerating, but that he did lose 30 pounds. (*Id.*) As stated above, in the course of the consolidated grievance, he told prison officials that he lost 30 pounds, ostensibly because of the portion sizes that were coming from the kitchen. (Wilcox Reply Decl. Ex. A at 7). Thus, defendant Dishaw's conduct was not the cause of plaintiff's allegedly excessive weight loss.

Defendant Dishaw denies that he ever deprived plaintiff of a meal tray or tampered with his meal trays at any time. (Dishaw Decl. ¶ 28). Defendant Dishaw also states that he is normally assigned to "Tour II" at Upstate which runs from 6:00 am to 2:00 pm each day, and he is not on duty during the dinner distribution which occurs at approximately 4:30 pm. (*Id.* ¶ 31). In addition, defendant Dishaw states that he is normally assigned to the A Gallery in 9 Building, and thus, he was not responsible for the distribution of meals in the "C" Gallery where plaintiff was housed following the December 31, 2014 misbehavior report. (*Id.* ¶ 32). Thus, to the extent that plaintiff alleges that he was denied food after December 31, 2014, defendant Dishaw could not have been the individual responsible for that denial.[16]

Defendant Dishaw states that the distribution of meals to inmates is noted in the 9 Building Logbook, which is attached as Exhibit D to his declaration. (*Id.* ¶ 30 & Ex. D).

---

[16] As stated above, defendant has justifiably interpreted plaintiff's amended complaint to allege that he was deprived of food only after the misbehavior report. However, in his response to the motion, plaintiff alleges that he was denied food at various times after the initial July 17, 2014 grievance, although plaintiff never specified when this denial occurred or how often it occurred.

Defendant has also submitted plaintiff's internal movement history, indicating his cell location from July 10, 2014 until March 28, 2015. (*Id.* Ex. D at 2). The court notes that defendant Dishaw was generally on duty for two day intervals, and he states that for each of the dates that he was on duty, the logbook indicates that breakfast and lunch were distributed to all inmates, including plaintiff at the appropriate times. (*Id.* ¶ 35 & Ex. D). The attached log book records corroborate this statement. Defendant Dishaw also states that if an inmate refuses his tray for any reason, it is noted in the logbook. (*Id.* ¶ 36). Defendant Dishaw states that although he was not on duty, the logbook indicates that plaintiff refused a tray during the 11:06 am lunch distribution on February 12, 2015. (*Id.* ¶ 37 & Ex. D - Dkt. No. 25-19 at 19).[17] There is no explanation as to why the "chow" was refused. (*Id.*)

Defendant has filed the declaration of Nancy Smith, Nurse Administrator ("NA") at Upstate. (Smith Decl.) (Dkt. No. 26). Attached to NA Smith's declaration are plaintiff's medical records. (Dkt. No. 26-1). Defendant argues that plaintiff's medical records show that, even assuming plaintiff lost thirty pounds, there were no adverse medical or health effects as a result of the weight loss. In fact, plaintiff's body mass index ("BMI") remained at an overweight level, even at his lowest weight. (Def.'s Mem. at 17).

In his grievance dated July 7, 2014, plaintiff claims that his normal weight was 238 and that he had already lost 30 pounds. (Wilcox Reply Decl. Ex. A at 8-15). His

---

[17] Exhibit D spans six documents on CM/ECF. Thus, I am citing to the portion of Exhibit D that is located at Dkt. No. 25-19.

medical records show that on July 10, 2014, plaintiff was on a "restricted diet,"[18] and his weight was being monitored.[19] (Smith Decl. Ex. A at 114). He was evaluated daily during this diet, and on July 10, 2014, the evaluation indicates that plaintiff's weight and blood pressure were "stable." (*Id.*) His weight was listed as 205 pounds. (*Id.*) Thus, as he stated, he had already lost 30 pounds before the alleged denial of food by defendant Dishaw started, after July 10, 2014. On July 11 and 15, 2014, plaintiff refused to be weighed.[20] (*Id.* at 112, 107). On July 12, 2014, plaintiff came to his cell door "smiling" and voiced "no complaints." (*Id.* at 110).

According to NA Smith, BMI is the measure of body fat based upon height and weight, used as a guide to healthy weight for patients. (Smith Decl. ¶ 8). NA Smith states that according to the National Heart, Lung, and Blood Institute, in association with the the United States Department of Health and Human Services and the National Institutes of Health, a normal BMI is between 18.5 and 24.9, while a BMI between 25 and 29.9 is considered overweight, and a BMI of 30 or more is considered obese. (Smith Decl. ¶ 9). Plaintiff's medical records indicate that plaintiff is 5'11" tall, and even at 205 pounds, plaintiff's BMI is 28.6, according to the BMI scale.[21] (Smith Decl. ¶¶ 10, 14).

---

[18] Plaintiff's medical records indicate that plaintiff was placed on a pre-hearing restricted diet beginning July 10, 2014 and ending on July 16, 2014. (Smith Decl. Ex. A at 105).

[19] NA Smith has also filed plaintiff's ambulatory health record ("AHR") beginning in June of 2014). The July 10, 2014 AHR entry repeats the information relative to plaintiff's weight and "clearance for pre-hearing restricted diet." (Smith Decl. Ex. A at 93) (July 10, 2014 AHR entry).

[20] Plaintiff has refused to have his "vital signs" taken and has refused to be weighed on other occasions. (Smith Decl. Ex. A at 102) (refusal on January 30, 2015).

[21] The relevant BMI calculator has been filed as Exhibit B to NA Smith's declaration. (Dkt. No. 26-2).

Plaintiff's BMI was in the overweight range, even at 205 pounds.

Plaintiff went to sick call on August 8 and 9, 2014, complaining about his feet and requesting anti-fungal cream. (Smith Decl. Ex. A at 92, 93). He requested self-carry Claritin for allergies, but did not mention any other problems and did not complain that he was hungry or that he was being denied food. On August 13, 23, 28, and 2014, he was still complaining about foot fungus and allergies. (*Id.* at 90, 92). He was seen again on September 8, 9, 10, and 23 2014, with the same complaints. (*Id.* at 87, 88). On September 23, 2014, plaintiff weighed 204 pounds. (*Id.* at 87). On October 2, 3, 10 and 14, 2014, plaintiff discussed his Claritin prescription, but there are no other complaints listed. (*Id.* at 83, 85). On October 13 and 20, 2014, plaintiff discussed both Claritin and Naproxen prescriptions. (*Id.* at 82). On October 21, 2014, plaintiff complained about allergy symptoms, and on October 25, 2014, he complained about constipation. (*Id.* at 81). He was told to increase his intake of fluids and increase his activity. (*Id.*) On November 1, 2014, plaintiff complained of flu symptoms. (*Id.* at 80).

On November 12, 2014, plaintiff complained of decreased urine output, and he was told to increase his fluids. (*Id.* at 79). On November 17, 18, 20, 21, and 22, 2014, plaintiff complained of constipation and was given Ducolax, but did not indicate that he was being denied food or that this could be the reason for his constipation. (*Id.* at 77, 78). On November 20, 2014, he was advised to increase his fluid intake and activity level. (*Id.* at 77). On November 23, 2014, the medical provider determined that the constipation could be caused by the overuse of one of the medications that plaintiff was taking. (*Id.* at 76). Plaintiff was seen several more times during November and

December of 2014, and into January of 2015. (*Id.* at 66-76). On December 9, 2014, he swore at the nurse because she told him that the light had to be on in his cell in order for him to be seen. (*Id.* at 73).

Plaintiff refused "vital signs" during an mental health "special watch"[22] on January 21, 22, and 28, 2015. (*Id.* at 64, 65). On January 29, 2015, plaintiff allegedly threatened to kill himself. (*Id.* at 62). On January 30, 2015, plaintiff was cleared to return to his cell block. (*Id.* at 61). Plaintiff was again placed on a restricted diet for two days as the result of a disciplinary issue from February 11 to 13, 2015. (*Id.* at 54). Plaintiff weighed 195 pounds on February 6, 2015. (*Id.* at 17). However, he refused to be weighed at the beginning of his restricted diet on February 11, 2015. (*Id.* at 55). On April 24, 2015, plaintiff complained of low back pain, he was examined for these complaints, and was prescribed medication. (*Id.* at 9). Plaintiff was seen again for his low back pain on May 11, 2015. (*Id.* at 8). On May 21, 2015, plaintiff was seen about his back, but admitted that he was non-compliant with his medications. (*Id.* at 7). On May 27, 2015, plaintiff was examined for his back problems, but the record shows that his weight was back up to 214. (*Id.* at 6).

NA Smith states that "contrary to plaintiff's claims of significant weight loss, his medical records indicate that plaintiff experienced a total weight loss of ten pounds between July 10, 2014 and February 6, 2015. (Smith Decl. ¶ 24). Plaintiff subsequently gained back the ten pounds, and then he gained an additional nine pounds between

---

[22] He was on a "special watch" because he had apparently said something about harming himself. (Smith Decl. Ex. A at 96-101).

February 6, 2015 and May 27, 2016. (*Id.*) At no time did plaintiff's weight drop to below an "overweight" range. (*Id.*) Thus, after the time that plaintiff claims defendant's alleged conduct started, he only lost ten pounds – 205 to 195, and not once did he mention to medical personnel that he was being denied food. NA Smith states that in her medical opinion, plaintiff did not suffer from significant weight loss from July 1, 2014 until July 30, 2015. There is absolutely no indication that plaintiff's health or nutrition was affected by his weight loss, or that it had anything to do with defendant Dishaw, because the thirty pounds that plaintiff lost initially was lost prior to July 10, 2014, when plaintiff alleges that he filed the grievance against defendant Dishaw which caused the alleged harassment and food deprivation. Plaintiff's Eighth Amendment claim may be dismissed.

## V.     First Amendment Retaliation

### A.     Legal Standards

In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendant. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (citations omitted). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Id.* at 380. The court must keep in mind that

claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration."  Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim.  *Bennett*, 343 F.3d at 137.

## B.    Application

Plaintiff claims that the misbehavior report issued by defendant Dishaw on December 31, 2014 was in retaliation for the July 17, 2014 grievance that plaintiff filed against the defendant.  Participation in the grievance process by an inmate is clearly protected conduct in the context of a retaliation claim. *Johnson v. Eggersdorf*, 8 F. App'x. 140, 144 (2d Cir. 2001); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 367 & n. 21 (S.D.N.Y. 2011) (collecting cases).  Thus, plaintiff meets the first requirement of a retaliation claim.  However, defendant argues that plaintiff cannot establish a causal connection between the plaintiff's activity and the defendant's alleged conduct.

A number of factors may be considered in evaluating whether such a causal connection exists. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).  These factors include: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his or her motivation. *Id.*  The causal connection "must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

In this case, the grievance that plaintiff alleges was the cause of the retaliation

was filed in July of 2014, and the defendant's misbehavior report was filed five months later, on December 31, 2014. In *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009), the Second Circuit found that a six month lapse in time between the protected activity and the adverse action was sufficient to support the inference of a causal connection. In his response to the summary judgment motion, plaintiff also alleges that the misbehavior report was only the culmination of the harassment that he underwent from defendant Dishaw. (Dkt. No. 28 at 3). If this were true, these facts would further support the temporal proximity factor.

An analysis of the remaining factors do not support plaintiff's retaliation claim. Although this court is not aware of plaintiff's prior disciplinary record, the fact that he was incarcerated at Upstate indicates that he was already in disciplinary housing. In addition, plaintiff did not prevail at the disciplinary hearing, and defendant Dishaw denied any retaliatory motivation for the misbehavior report.

Finally, and most importantly in this case, even if plaintiff sufficiently alleges a causal connection, the claim will fail if the defendant can show that he would have taken the same action, even in the absence of the protected conduct. *Quezada v. Roy*, No. 14 Civ. 4056, 2015 WL 5970355, at *20 (S.D.N.Y. Oct. 13, 2015) (quoting *Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003)). In *Scott*, the court found that

> Regardless of the presence of retaliatory motive . . . a defendant may be entitled to summary judgment if he can show dual motivation, i.e., that even without the improper motivation the alleged retaliatory action would have occurred. Plaintiff has the initial burden of showing that an improper motive played a substantial part in defendant's action. The burden then shifts to defendant to show it would have taken

exactly the same action absent the improper motive.

*Id.*

The misbehavior report charged plaintiff with having an untidy cell, harassment, refusing to obey a direct order, and threats. (Hickey Decl. Ex. B at 1). Plaintiff was afforded a Tier II disciplinary hearing on January 13, 2015. (*Id.* at 2). The misbehavior report stated that defendant Dishaw was making rounds on 9 upper A gallery and observed that plaintiff had a sheet hanging up in his cell along with a towel. (T. at 3). Plaintiff had previously been warned about such behavior, and defendant Dishaw stated that he gave plaintiff a direct order to remove the hanging items, to which plaintiff responded "'yeah I'll get to it later C.O.'" (*Id.*) Defendant Dishaw asked plaintiff to remove the items again, and plaintiff responded "'go fuck yourself. I am a grown man you ain't telling me what to do.'" (*Id.*) Plaintiff then told defendant Dishaw that he would "fuck [him] up." (*Id.*) At that point, plaintiff's cell-mate got up and removed the items even though they belonged to plaintiff. (*Id.*) Plaintiff's sheets and towels were confiscated and deprivations were issued. (*Id.*)

Plaintiff called his cell-mate, Anthony Huger, as a witness, and the hearing officer called defendant Dishaw to testify. (*Id.*) Defendant Dishaw repeated a summary of what he wrote in his misbehavior report, and then he was asked, at length, about the alleged retaliation, which he denied. (*Id.* at 6-10). Plaintiff's cell-mate that Dishaw came to the cell and asked "to take down the a [sic] (inaudible) or something." (*Id.* at 11). Inmate Huger then stated that plaintiff said "give me a minute," but Dishaw asked plaintiff to "take it down now." (*Id.*) Inmate Huger stated that he saw that "the situation was about

to get out of hand *so I jumped down and took it down*." (*Id.*) (emphasis added). It is clear from Inmate Huger's testimony that there was something hanging in the cell that defendant Dishaw told plaintiff to take down. It is also clear that plaintiff did not take the items down immediately, even though Inmate Huger stated that defendant Dishaw was harassing plaintiff and trying to instigate a fight between the two cell-mates. (*Id.* at 11-12).

The hearing officer then asked plaintiff:

> Spinner: Okay did you at any point say to the officer "Go fuck yourself I'm a grown man. You ain't telling me what to do. I'll fuck you up."? Did you say that to the officer?
>
> Artis: Did I say that to the officer?
>
> Spinner: Yeah did you?
>
> Artis: Yeah.
>
> Spinner: You said that to the officer?
>
> Artis: Yeah.

(*Id.*) Plaintiff and Inmate Huger attempted to explain that plaintiff's conduct was justified because defendant Dishaw was constantly harassing both inmates, and harassing plaintiff in particular. However, plaintiff admitted the conduct with which he

was charged, regardless of any attempts to justify it.[23]  He was found guilty accordingly.

Plaintiff admitted during his deposition that the sheet was hanging in the cell, although

plaintiff testified that the sheet belonged to Inmate Huger. (Pl.'s Dep. at 44). Thus,

regardless of defendant Dishaw's motivation, Dishaw could have filed the misbehavior

report in the absence of the protected conduct.  At worst, defendant Dishaw could have

had a dual motivation, and plaintiff's retaliation claim would still fail.

      **WHEREFORE**, based on the findings above, it is

      **RECOMMENDED**, that defendant's motion for summary judgment (Dkt. No.

25) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY**.

      Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have

fourteen (14) days within which to file written objections to the foregoing report.

Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT

TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE

APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing

*Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: September 12, 2016

                                      *Andrew T. Baxter*

                                    **Hon. Andrew T. Baxter
U.S. Magistrate Judge**

---

[23] Later during the disciplinary hearing, plaintiff stated that "I would a did [sic] everything he wanted to had he would a said [sic] it respectfully.  I was about to do it until he started cursing and my cellie just jumped off cause he was asleep." (T. at 13).  This statement is additional evidence that plaintiff committed the misbehavior.  He believed that he was justified in doing so because defendant Dishaw was allegedly harassing them and was not "respectful."  Unfortunately for plaintiff this was not a defense, and negates his retaliation claim.